MCDONALD, APPELLANT, *v.* FRUTH ET AL., APPELLEES.

(No. 13-87-3—Decided
August 2, 1988.)

*Anderson, Boyk & McCulley* and
*Charles E. Boyk,* for appellant.
*Carpenter, Paffenbarger & Mc-Gimpsey* and *T. L. Paffenbarger,* for
appellees.

GUERNSEY, J. This is an appeal by
the plaintiff, James P. McDonald, from
a summary judgment of the Court of
Common Pleas of Seneca County
rendered in favor of the defendants,
Robert L. Fruth, an individual, and
Ohio Mutual Insurance Associa-
tion/United Ohio Insurance Co., his
liability insurers. Fruth Farms, Inc.
was also named as a party defendant,
but it has not been served; its existence
has never been established and is
denied.

Plaintiff and his father were
itinerant painters who traveled about
the United States seeking work, usu-
ally at farms where they had par-
ticularly observed the need of paint on
the roofs of farm buildings, and where
they agreed to paint same for an
amount agreed with the farm owner.
On the day here involved plaintiff,
driving his father's pick-up truck car-
rying an airless paint sprayer pump,
about two hundred feet of hose equip-
ped with a sprayer head, a twenty-four
foot extension ladder, and a number of
five-gallon drums of asphaltic alumi-
num paint, but carrying no special
safety equipment, ropes, etc., of any
kind, showed up at defendant Fruth's
farm where plaintiff suggested to
Fruth, while his father remained in the
pick-up, that plaintiff spray-paint the
roofs on various of Fruth's farm
buildings. After negotiation a price
was agreed between them for the labor
and materials necessary for plaintiff to
accomplish the work. Nothing was
discussed as to how the work would be
accomplished, as to the existence of
any defects or dangers existing on the
roofs, and no warnings were given by
Fruth to the plaintiff, nor did Fruth
supply the plaintiff with any safety
equipment of any sort. Plaintiff pro-
ceeded to paint several roofs, wearing
tennis shoes, while Fruth went on
about his own work. Plaintiff then pro-
ceeded to paint a barn described as
having a central A-frame high gable
surrounded by lower lean-to sheds
with roofs of much lesser slope. On all
the buildings plaintiff would gain ac-
cess to the roof by climbing his exten-
sion ladder and then spray either from
the top of the ladder or by walking
upon the roof.

In the latter event, the plaintiff's
father would stand upon the ladder
and assist in feeding the spray hose to
plaintiff and in keeping it out of his
way. At the time in question, however,
plaintiff's father was on the ground,
away from the barn, discussing crops
and farm animals with Fruth. In that
interim, while no one was watching
him, plaintiff fell to the ground causing
severe injury to two of the vertebrae in
his neck. This is the injury on which the
action for damages in the lower court
and the appeal to this court is based.

Plaintiff filed his complaint joining
an alleged cause of action against

Fruth for failing to provide a safe place of employment, failing to warn plaintiff of unusual hazards upon the premises that Fruth should have been aware of, and failing to provide adequate safety devices/safeguards to protect plaintiff; an alleged cause of action against Fruth for breach of his statutory duty under R.C. 4101.11 to protect plaintiff as an employee/frequenter of the premises by providing a safe place of employment and furnishing and using safety devices and safeguards, etc.; an alleged cause of action against Fruth for breach of his statutory duty under R.C. 4101.12 to protect plaintiff by providing a safe place of employment, to furnish adequate safety devices and safeguards, and to do every other thing reasonably necessary to render such employment and place of employment safe; an alleged cause of action against defendant insurers in that their behavior has not constituted a good faith effort to settle the case; and an alleged cause of action against defendant insurers for breaching their duty of good faith in failing or refusing to settle the case and/or pay the plaintiff as provided in its insurance contract with defendant Fruth, which behavior is arbitrary, capricious, not based on any reasonable justification, and based on actual malice, fraud, and/or insult on the part of the insurer. In the first three causes of action, the plaintiff seeks compensatory damages for his injuries; in the fourth, he seeks interest on the claimed judgment for compensatory damages from the date of the accident until paid; and in the fifth cause of action, plaintiff seeks punitive damages.

Defendants' motion for summary judgment was decided by the lower court on the depositions of plaintiff and defendant Fruth, and on the affidavit of the plaintiff. After the judgment in favor of defendants, plaintiff moved for separate findings of fact and conclusions of law, and the court rendered same, adopting those proposed and submitted by the defendants, the plaintiff apparently electing not to propose any.

Plaintiff assigns error of the trial court:

"I. * * * In granting the defendants' motion for summary judgment with regards to defendant Robert Fruth.

"II. * * * In granting the defendants' motion for summary judgment because the court's judgment is inconsistent with the findings of fact and conclusions of law.

"III. * * * In holding as a matter of law that the doctrine of assumption of the risk is available to the defendants which is erroneous and inconsistent with the findings of fact and conclusions of law.

"IV. * * * In granting the defendants' motion for summary judgment because there are genuine issues as to material facts with regards to Ohio Mutual Insurance Association and United Ohio Insurance Company."

The first of these assignments of error discounts the application of common-law decisions insulating the owner of premises from liability to an independent contractor working thereon, and emphasizes the claimed application of R.C. 4101.11 and 4101.12 to create a liability to an employee or to a frequenter/independent contractor. The second assignment of error claims an inconsistency between the finding of the trial court that the plaintiff was an independent contractor, a decision alleged to have been reached by the trial court by improperly "interpreting" the findings of fact, followed by its conclusion that there was no duty owed to the plaintiff because he proceeded with the work knowing and appreciating the dangers that were involved, all contrary to

*Viock* v. *Stowe-Woodward Co.* (1983), 13 Ohio App. 3d 7, 15, 13 OBR 8, 16, 467 N.E. 2d 1378, 1386. The third assignment of error rests on plaintiff's assertion that the defense of assumption of risk no longer exists, having been merged with the defense of contributory negligence by Ohio's adoption of R.C. 2315.19, the comparative negligence statute. *Anderson* v. *Ceccardi* (1983), 6 Ohio St. 3d 110, 6 OBR 170, 451 N.E. 2d 780. See, also, *Hirschbach* v. *Cincinnati Gas & Elec. Co.* (1983), 6 Ohio St. 3d 206, 6 OBR 259, 452 N.E. 2d 326, as it applies to assumption of risk and contributory negligence no longer barring recovery under the Ohio "frequenter" statutes. Finally, the fourth assignment of error rests on plaintiff's assertion that defendant insurers wrongly claim that plaintiff is barred from suing them directly in the original action against the insured on the third-party beneficiary theory of liability (see *Chitlik* v. *Allstate Ins. Co.* [1973], 34 Ohio App. 2d 193, 63 O.O. 2d 364, 299 N.E. 2d 295), when, in fact, the insurers are being sued, instead, for their independent torts of bad faith and outrage. *Thompson* v. *Commercial Ins. Co. of New York* (Fla. 1971), 250 So. 2d 259; *Shingleton* v. *Bussey* (Fla. 1969), 223 So. 2d 713; and 1 Restatement of the Law 2d, Torts (1965), Section 46.

Thus, it will be observed that the second, third and fourth assignments of error present essentially hypothetical arguments wholly subordinate to the first assignment of error, for if error occurred as to any one of such assignments there could be no prejudice to the plaintiff in such respect, if, at the same time, applying summary judgment principles, there was no error as claimed in the first assignment of error, because on the issue of liability of defendant owner to the plaintiff there is no genuine issue as to any material fact and defendant owner is entitled to judgment as a matter of law. It follows, of course, that if defendant owner is not liable to plaintiff then his liability insurers have no duty to plaintiff under any supposed theory of action. We will, therefore, proceed to determine whether defendant owner was not liable to plaintiff as a matter of law.

Examination of the undisputed facts appearing in the depositions and in the affidavit discloses that under no theory was the plaintiff an employee of the owner. Regardless of any relationship which plaintiff may have had with his father arising from the ownership of the equipment used by plaintiff or from the turning over to the father of the proceeds of the venture as intended by the plaintiff, the plaintiff's relationship to the owner was as an independent contractor. The approach was made to the owner by the plaintiff, all negotiations including the establishing of the oral contract price were carried on by the plaintiff with the owner, and the meeting of the minds occurred between them. The plaintiff never disclosed otherwise to the owner. Although the owner established which roofs were to be painted, the manner in which that was to be accomplished was in the sole control of the plaintiff, and the owner proceeded to withdraw to his own labors without attempting to exercise any control over the performance of the plaintiff's work. We find no facts supporting any other relationship of plaintiff with the owner other than that of independent contractor. The defendants claim this relationship, or, at least, that the plaintiff is no other than the employee of an independent contractor, and the plaintiff largely concedes that such is the fact, or does not show any facts requiring a conclusion to the contrary. In *Wellman* v. *East Ohio Gas Co.* (1953), 160 Ohio St. 103, 51 O.O. 27, 113 N.E. 2d 629,

the common-law principle of law is stated at paragraph one of the syllabus:

"Where an independent contractor undertakes to do work for another in the very doing of which there are elements of * * * danger * * *, no liability * * * ordinarily attaches to the one who engaged the services of the independent contractor." See, also, *Hirschbach* v. *Cincinnati Gas & Elec. Co., supra.*

The plaintiff asserts then, and the defendants acknowledge, that under R.C. 4101.11, establishing the duty of an "employer" to protect employees and frequenters, and under R.C. 4101.12, establishing the duty of an "employer" to furnish a safe place of employment, the definitions of Title 41 equate the term "employer" to an owner or occupier of premises and require business invitees to be considered as frequenters. *Westwood* v. *Thrifty Boy Super Markets, Inc.* (1972), 29 Ohio St. 2d 84, 58 O.O. 2d 154, 278 N.E. 2d 673. However, in *Eicher* v. *United States Steel Corp.* (1987), 32 Ohio St. 3d 248, 512 N.E. 2d 1165, the Supreme Court decided:

"The duty to frequenters of places of employment, set forth in R.C 4101.11, does not extend to hazards which are inherently and necessarily present because of the nature of the work performed, where the frequenter is the employee of an independent contractor." *Id.* at syllabus.

It is true that the Supreme Court did then appear to qualify this conclusion by stating at 249, 512 N.E. 2d at 1167:

"* * * Such an invitee may recover when the injury results '* * * by reason of the abnormally dangerous condition of the premises, only if the principal employer has, and the servant has not, actual or constructive notice of the existence of such condi-

tion.' *Davis* v. *Charles Shutrump & Sons Co.* (1942), 140 Ohio St. 89 * * *."

Here, in our view as heretofore expressed, the plaintiff was the independent contractor as well as the frequenter doing the work and there was no separate or different knowledge by a principal employer involved than the knowledge of plaintiff of the conditions on the roof. The testimony of defendant Fruth discloses, among other things, that Fruth, who had purchased the farm with the buildings thereon in March 1981, had lived nearby and had seen the buildings for some twenty years before on a regular basis; that he knew that the previous owners and tenants had taken reasonably good care of the buildings; that he knew that the roof on the barn in question had been painted prior to 1981, but had not been painted since he purchased same; that prior to buying same he had made no close-up inspection of the barn roof, and had never been up on the barn roof prior to August 14, 1984, the date of the event in question; that he knew the roof was in good repair but was starting to show a little bit of weather "like possibly rust showing through"; that in his opinion there were no problems with the roof, and he did not warn the plaintiff of anything dangerous or tell him to be careful; that he estimated that the barn roof had been previously painted within ten years of the incident; that the roof was a "standing seam metal roof," *i.e.,* "made out of metal and where they're put together there's a seam that is raised maybe two inches * * * so every two feet you might have a seam on the roof"; and that whether they are slippery to walk on depends on how recent the paint job.

The plaintiff testified in his deposition taken November 5, 1985, among other things, that he was born on September 12, 1960; that whatever he had learned in contracting work he had

learned from his father, having worked with him on and off, part-time, since he was a child; that he slipped a couple of times while painting the standing seam metal houseroof, more or less because of the steepness of the roof; that at the time in question he had painted the lean-to which goes all the way around the back of the building "on back around, I was coming back to the end of it"; that there was a peak roof on the top of the barn," "and there was a lean-to that went around it, kind of on different levels"; that he had painted the peaked roof on one side of the barn by putting his ladder up to the lean-to, getting on the lean-to, and then walking up to the peaked roof; that "I really did never went to the peak," I just stepped up the side of it and painted up towards the peak"; that after finishing the one side of the peaked roof and painting around on the lean-to roof, he was standing on the flat part of the lean-to roof; that "I was painting along and the hose got built up underneath my feet and I looked around and the hose was built up"; that his father "wasn't there so I walked over and was throwing the hose off from being behind me, I started to kick the hose away from behind me with my hand"; that "I went to step upon the roof, to go on up and paint the A shape when I slipped"; that it was when he was trying to negotiate from one roof to another that he slipped; that he probably had one foot on the lean-to roof and one on the top roof, and he believed his right foot, which was the one up on the roof, was the foot which slipped and came off the edge of the roof; that he had not yet painted the area where he stepped; that he could not see anything peculiar about that section of the roof; that he did not fall back onto the lean-to roof, but off onto the ground; that it was "[j]ust that it was an older roof, you know, and had been painted before"; and that he had not looked intently at the area where he

was going to step, but just turned and stepped.

In his affidavit sworn to on September 12, 1986, plaintiff stated additionally to his testimony in his deposition, among other things, that:

"Once I was on the barn roof I observed numerous scaling and loose paint shingles on the sheet metal roof, making the roof much more dangerous than it appeared from ground level. It was obvious once I got on the barn roof that the maintenance was very poor.

"* * *

"It is my belief that if Robert Fruth had provided me with the proper safety equipment and warned me of the dangerous condition of the loose shingles on the roof that I would not have slipped and broken my neck."

Obviously, there was no condition upon the roof to which the plaintiff testified of which the defendant owner was aware and which was abnormal and not to be anticipated by the plaintiff. In his deposition the plaintiff testified to nothing which may have existed as a possible proximate cause to his slipping other than it was "just that it was an older roof * * * and had been painted before." His affidavit then speaks of "numerous scaling and loose paint shingles * * * making the roof much more dangerous than it appeared at ground level." Assuming that these conditions proximately caused his fall, rather than his inattention or lack of care to which he testified, they were then hazards which were inherently and necessarily present because of the nature of the work which he was engaged to perform. Even considering the exception set forth in *Eicher, supra,* as to recovery because of lack of the servant's actual or constructive notice of the existence of an abnormally dangerous condition, it appears incontrovertible from plaintiff's affidavit that plaintiff became aware of the conditions of which he now complains at the moment

when he reached the barn roof, and, in no event, therefore, could he come within the *Eicher* exception.

We thus conclude that not only has plaintiff failed to counter any of the evidentiary material available to the defendants on their motion for summary judgment showing that the owner had no common-law duty of care to the plaintiff which the owner failed to perform, but has also failed to counter the showing by that evidentiary material that the owner owed no duty to plaintiff under either R.C. 4101.11 or 4101.12 which the owner failed to perform.

Accordingly, the first assignment of error is not well-taken, and, it thus appearing as a matter of law that the defendant owner was not liable to the plaintiff, each of the other three assignments of error are likewise without merit.

Having found no error prejudicial to the plaintiff in any of the respects assigned and argued, the judgment of the Court of Common Pleas of Seneca County must be affirmed.

*Judgment affirmed.*

MILLER, P.J., and COLE, J., concur.

J. THOMAS GUERNSEY, J., retired, of the Third Appellate District, was assigned to active duty pursuant to Section 6(C), Article IV, Ohio Constitution.